WILLIAM COLEMAN, adm'r, &c. and others, *vs.* THE SECOND AVENUE RAILROAD COMPANY, impleaded with Benjamin T. Sealey.

On the 11th of December, 1852, the common council of the city of New York granted to P. and others the perpetual right to build and run a railroad through the Second avenue, for the transportation of passengers. On the 15th of December, 1852, an agreement, pursuant to the resolutions of the common council, was entered into between the city and the grantees, by which the latter accepted the grant, and, for themselves and "their successors" agreed that they would fulfill and keep the stipulations, conditions, &c. On the 12th of January, 1853, a company called the "Second Avenue Railroad Company," was incorporated under the general railroad act, the directors in which were all the grantees named in the license, and four other persons. And by an instrument dated January 25, 1853, and signed by all the grantees but one (M.) they assigned the grant to the said railroad company, for the consideration of $200,000, no part of which was ever paid. The company was organized with the expectation that the grant was to be transferred to it, and the assignment was executed pursuant to the plans of the promoters of the company. In an action by the assignee of the grantees, against the railroad company to recover the consideration agreed to be paid by the latter, for the transfer,

*Held,* 1. That the principle that trustees, directors and others, acting in a trust relation, cannot. make valid contracts with themselves, affecting the trust estate, was applicable to such assignment.

2. That it was not in the power of the owners of the grant from the city, after having formed themselves into a corporation, and having held out the idea that the corporation owned the right to the road—to name the price for the transfer of the grant from themselves to the company, and to vote as directors of the corporation, to themselves as owners of the grant, the whole capital stock, for the privilege obtained from the city.

3. That the same reasons which prevented the directors of the railroad com-

Coleman *v.* Second Avenue Railroad Co.

pany from fixing their own value upon the grant, operated to preclude them from making any acknowledgments by resolution signed by their secretary and entered in their minutes, which would have the effect to take the case out of the statute of limitations.

4. That the fact of the grant having been assigned by an instrument under seal, had no bearing upon the question of the statute of limitations; the action not being brought upon the assignment, or for the breach of any agreement under seal, but to recover the price of property conveyed at an agreed or implied valuation. And that more than six years having elapsed, since the sale, the statute was a conclusive bar.

THIS is an appeal from a judgment against the defendants, the Second Avenue Railroad Company, for $246,791.93, entered herein on the 28th day of June, upon the report of Hon. Benjamin W. Bonney, referee, dated 7th June, 1866, and upon the findings of fact and of law in said report contained. The action is *assumpsit*, brought by the plaintiff Coleman in his own right, and as administrator, and Catharine Mulligan, administratrix, &c. of Richard T. Mulligan, deceased, to recover the sum of $200,000 and interest, expressed in and alleged to be the consideration of the transfer to the defendants by the plaintiff's assignors of the license (called for convenience a grant) from the corporation of the city to Denton Pearsall and others, dated 15th December, 1852, hereinafter more fully set forth. On the 15th December, 1852, the mayor, &c. of New York granted a license to Denton Pearsall, Richard T. Mulligan and others, " to lay a grooved railroad track" in certain streets and avenues named (comprising the route of the Second Avenue railroad) under certain restrictions, and subject to regulation by the common council as to fare, &c. The parties named agreed for themselves and " their successors" that they would fulfill and keep the stipulations, conditions, &c. In the resolution of the common council authorizing the license, the parties to whom it is to be granted are mentioned as the " said company," an incorporation of the associates being evidently contemplated. By the terms of the license, the road was to be commenced in six months, and completed to Forty-second street within one

year, and to Harlem river within three years. On the 13th of January, 1853, the persons named in the license, (except Daniel J. Sherwood,) together with William L. Youle, (who had acquired one-fourth interest in the grant,) calling themselves " The Grantees for the Second Avenue Railroad Company," met pursuant to previous call. A committee was appointed to advise with counsel and report " the most advisable manner of organizing the company." An adjourned meeting of " the grantees of the Second Avenue Railroad Grant" was held January 17th, 1853. Present, all the persons named in the license and William L. Youle. The committee unanimously recommended " an organization under the general railroad act," and the report was adopted unanimously. The name of the company was agreed upon, the term of existence fixed, and the shares were fixed at $100 each. The capital stock of the company was fixed at $800,000, with the privilege of increase to $2,500,000. The secretary *pro tem.* was directed to procure a book for the copying of the minutes of the company. The secretary was directed to wait on the counsel and have him prepare the certificate and other papers necessary for organization, " which the grantees are hereby requested to call at Mr. Davies' office and execute." The secretary was directed to have a copy of the by-laws to submit to the next meeting. January 20th, 1853, another meeting was held.

The secretary reported, " having had the necessary papers prepared for organization under the general railroad act," and Mr. Davies, the counsel, reported having obtained all the necessary signatures, and deposited the papers in the post office, directed to the comptroller at Albany, and reported the names of the directors, for the first year, inserted therein. The names of the directors were : D. Pearsall, Abm. Allen, D. J. Sherwood, Chas. Miller, Henry Goff, J. C. Skaden, R. T. Mulligan, W. L. Hall, A. B. Rapele, (all the grantees named in the license,) and W. L. Youle, Adam W. Youle, Zophar Pearsall, Chas. Hawkins, (not named in the license.)

The certificate of incorporation was dated January 19, 1853, and acknowledged and sworn to on the 20th of January, 1853, and filed on the 21st day of January, 1853. It stated that $1500 had been in good faith paid to the directors on the subscription.

The certificate of incorporation was signed by twenty-five individuals (the necessary statutory number), including all the "grantees" and the four others named as directors, and each agreed to "take the number of shares of stock in said company set opposite to his name."

| | |
|---|---|
| Denton Pearsall subscribed . . . | 1400 shares. |
| W. L. Youle subscribed . . . . | 1400 shares. |
| Abraham Allen subscribed . . . | 800 shares. |
| Each of the others (22) subscribed for 200, . | 4400 shares. |
| | 8000 |

Thus absorbing the whole capital of $800,000.

The entire stock was taken for the benefit of the "grantees" and W. L. Youle, in the following proportions, viz.

| | |
|---|---|
| Denton Pearsall and W. L. Youle (assignee of a portion of Pearsall's interest,) each 2000 shares, . | 4000 |
| A. Allen, 1200 shares, . . . . . | 1200 |
| The others, (seven in number,) 400 shares each, . | 2800 |
| | 8000 |

No other person appears to have been interested in any of the stock, or to have made any payment thereon, until June 3, 1853. They are called "shareholders" in the call for $1,500 made on the 20th January, 1853, and respond to the call as such, by paying, on that day, precisely that sum in part payment for the whole 8000 shares.

By an instrument dated 25th of January, 1853, and signed by all the grantees but Mulligan and by William Coleman, as his administrator, C. Mulligan, Mary E. Mulligan and Jas. B. Mulligan, for Mulligan's interest, they assigned the grant to the railroad company for the consideration of $200,000, expressed therein. This, though bearing date the 25th of

January, 1853, was not executed and delivered until November, 1855. At the same time the defendants passed a resolution to issue their bonds to the grantees, for $200,000, payable in ten years, with semi-annual interest. But it was admitted by the pleadings that the $200,000 consideration money in the assignment had never been paid.

The whole interest in the subject matter of the action was vested in the plaintiffs and the defendant Sealey. The evidence of this was as follows : Letters of administration to the plaintiffs, upon the estate of R. T. Mulligan, deceased, dated December, 1854. Assignment to the plaintiff Coleman, dated December, 1861, from D. Pearsall and seven others of the grantees, who then owned all the interests, except such as belonged to Sealey.

Thus the whole interest, and the claim for its price, was centered in Coleman, the administrator of Mulligan, and Sealey. Sealey, having refused to be plaintiff, was made a defendant.

The referee reported in favor of the plaintiffs for the amount claimed, with interest; and the defendants appealed from the judgment.

*John Slosson, Wm. F. Allen* and *W. Hutchins,* for the appellants. I. The resolutions of the common council, embodied in the agreement of the 15th of December, 1852, giving permission to the plaintiffs' assignors to lay a railroad track in Second Avenue, &c. are absolute in their terms, unlimited as to time, and without the reservation of any right of revocation. *If valid,* they created in the grantees a species of freehold interest in the soil of the street, and constituted, when accepted by them, an irrevocable contract, which the corporation could never annul, and they created a franchise, which no power but the sovereign (the legislature) can create. No power of this description has ever been delegated to the common council by the sovereign power. The rights of the corporation in the public streets are held by

them in trust for the people, and its control over the streets is one of mere police regulation. Those resolutions, therefore, were *void*, as purporting to create a franchise which the common council had no power to create, to vest in the grantees an exclusive interest which that body had no power to convey, and as divesting the corporation of its exclusive control over streets, which it holds in trust for the public, and is not authorized to relinquish. (*Milhau* v. *Sharp*, 27 *N. Y. Rep.* 611. *People* v. *Kerr, Id.* 188. *Davis* v. *The Mayor*, 14 *id.* 506.) These decisions are not affected or changed by the case of *The Mayor* v. *The Second Avenue Railroad Co.* (12 *Abb.* 364, *affirmed*, 32 *N. Y. Rep.* 261.) The question there arose between the *two parties* to the agreement, and the Court of Appeals expressly refused to consider the question of the *validity* of this grant. The court said "it was not open to controversy *in this litigation*," and that " after the grant of the franchise," &c. " the common council were not in a position to *deny* the *legal* existence of the franchise." The great question in that case was, whether the common council, under its legislative power, could impose a *tax for revenue* on this company, under the name of a license fee.

II. But if these resolutions and agreement of the 15th of December, should be held not to be absolutely void, but to constitute a species of permissive license, or as conferring some rights; those rights (by whatever name they may be called) vested, by operation of law, in the corporation as soon as it was formed, and were subsequently confirmed in the corporation by the act of April 4, 1854.

III. The grantees, by the constitution and by-laws which, as directors, they adopted, have, in express terms, vested in the shareholders of the company all their rights under the grant, and, as well by said constitution and by-laws as by their acts, and their relation as trustees, are estopped from denying this. Had a transfer of the grant to the company at any time been necessary to the exercise by the defendants

of their corporate franchises, they could have enforced it in equity without any pecuniary equivalent.

IV. It follows from all this that there was no consideration for the transfer of it in November, 1855, on which this action is based.

V. There was no contract or agreement, and, in the nature of things, there could be none upon which the plaintiff can recover ; and this question was distinctly raised at the close of the plaintiff's case, and at the close of the trial. The foundation of the action, and the recovery, was the pretended assignment, bearing date January 25, 1853, but never executed until November, 1855, and the resolution of the directors of the defendants, adopted November 15, 1855 ; rescinded November 20, 1855, but relied upon as an agreement to pay a given sum therefor. There were present of the directors at the meeting of November 15, 1855 : 1. Denton Pearsall, 2. Daniel J. Sherwood, 3. A. B. Rapelye, 4. R. H. Goff, original licensees, 5. W. L. Youle, an assignee of ten equal shares or parts of the license, from January 10, 1853, and before the incorporation of the defendants, until January 24, 1862, when he assigned to the plaintiff ; 6. William Coleman, the plaintiff, who is also administrator of R. T. Mulligan, one of the licensees, 7. Adam W. Youle, 8. Charles H. Hawkins, 9. James B. Mulligan. The directors not present, were : 1. Charles Miller, 2. Joseph C. Skaden, both original "licensees," 3. James B. Mulligan, one of the assignors to the defendant, 4. Zophar Pearsall.

Of the nine directors present, six were interested adversely to the corporation in the transaction. Of the thirteen directors present and absent, eight were thus interested.

A contract or agreement, no matter how formal and deliberate, or by what solemnities entered into, between directors or trustees of a corporation, and especially a majority of such directors or trustees, and the corporation, which can only operate by and through its board of directors, either of sale or purchase, *or fixing the price and value of the thing*

*bought or sold, is absolutely void.*  (1.) Directors of a corporation are trustees of an express trust, and act in a fiduciary capacity for the shareholders, and are subject to all the rules by which trustees are controlled and restricted in their dealings with their *cestui que trust,* or in respect to the trust funds or property.  (*Cumberland Coal Co.* v. *Sherman,* 30 *Barb.* 553, *and cases cited by the court. Abindon Railway Co.* v. *Blaik,* 1 *McQueen,* 461.  *Davoue* v. *Fanning,* 2 *John.* 252.  *Michoud* v. *Girod,* 4 *How.* (*U. S. R.*) 503.  *N. York and North Midland R. R. Co.* v. *Hudson,* 16 *Beav.* 485.  *Robinson* v. *Smith,* 3 *Paige,* 222.  *Claflin* v. *Farmers and Citzens' Bank,* 25 *N. Y. Rep.* 293.  *Kenerwell* v. *Greitung,* 2 *Gratz's cases,* (*Pa.*) 125.)  (2.) Although a majority of the directors have no interest adverse to the corporation, a contract or agreement in behalf of the corporation with one of these associates and a co-director, will not be sustained. The shareholders as well as the directors are entitled to the benefit of the services and advice of every director, and no one may, for his own advantage, in matters concerning his own interest, deal with his associate directors.  (*Cases cited above.  Whicheote* v. *Lawrence,* 3 *Ves.* 751.)  In the present case, two-thirds of the directors present were interested adversely to the corporation and the *cestui que trust* for whom they were.bound to act "with honesty and fidelity." (3.) The case cannot be brought within the principle of the cases which have, to a limited extent, and upon its being shown beyond all question that the contract or dealing has been in all respects fair and equal, and after *full information* to the *cestui que trust,* sustained contracts and dealings between the trustees and *cestui que trust* in respect to the trust property.  These cases only apply where the *cestui que trust* is *sui juris* and competent to deal for himself.  Even such transactions are sustained with great hesitancy, and the leaning of the courts is against them.  The *onus* in such cases is always on the trustee.  (*Story's Eq. Jur.* §§ 30, 311, 321.  *Edwards* v. *Myrick,* 2 *Hare,* 60.  *Coles* v. *Trecothick,*

9 *Ves.* 247. *Hatch* v. *Hatch, Id.* 296. *Morse* v. *Royal,* 12 *id.* 372.) The legal presumptions are against such transactions. (4.) Neither is the case within the principle of a very few cases, in which, by a divided court, it has been decided that a director of a corporation may recover for services performed, under a contract with the other directors, when the evidence establishes the fairness of the contract and partiality and fraud is negatived. (*Geer* v. *School Dist. &c.* 6 *Verm. Rep.* 76. *Rogers* v. *Danbury U. Society,* 19 *id.* 191. *Sawyer* v. *Meth. Ep. Soc.,* 18 *id.* 409.) There is not a particle of evidence as to the value of the transfer of the right and franchise professed to have been assigned. The rule prohibiting trustees and agents from dealing with their *cestuis que trust* and principals, or in the matter of their trust or agency, is elementary. This is one of the fundamental doctrines, equally recognized by the common law and in equity, in respect to which there is but one language, and that is condemnatory of every violation of this wholesome restriction. The reason and necessity of the rule are well exemplified in this case. The following are a few of the cases illustrative of the rule. (*N. Y. Cent. Ins. Co.* v. *Nat. Prot. Ins. Co.,* 4 *Kern.* 85. *Utica Ins. Co.* v. *Toledo Ins. Co.,* 17 *Barb.* 132. *Brentley* v. *Columbian Ins. Co.,* 17 *N. Y. Rep.* 421. *Packhurst* v. *Alexander,* 1 *John. Ch.* 194. *Reed* v. *Warner,* 5 *Paige,* 650.) (5.) Courts will set aside contracts of this character, upon the application of a single shareholder—*a fortiori,* the faithless trustees cannot be permitted by themselves or their assignees to enforce the illegal contract by action brought for that purpose. (*Angell & Ames on Corp.* §§ 391–193. *Robinson* v. *Smith,* 3 *Paige,* 222. *Abbot* v. *Am. Hard Rubber Co.,* 33 *Barb.* 580.) Here every shareholder, through the directors, protest against the claim, and demand to be released from the pretended contract and agreement. (6.) The alleged contract was on the 20th of November, 1855, rescinded by the unanimous vote of twelve or thirteen directors, the plaintiff and his assignors

voting to rescind. This act was a clear and distinct relinquishment of all claim under the resolution of the 15th of November. (2 *Pars. on Cont.* 189 *et seq. and cases cited in note. De Peyster* v. *Pulver*, 3 *Barb.* 284.)

VI. The action was barred by the statute of limitations. The cause of action accrued, if at all, on the 15th of November, 1855. The action was commenced December 9, 1861. This objection was taken at the close of the plaintiff's case, and again at the close of the evidence, and overruled on each occasion, and an exception taken to the ruling. (1.) The cause of action was within the six-year limitation prescribed by the statute. (*Code*, § 91. *Borst* v. *Corey*, 15 *N. Y. Rep.* 505. 6 *Cowen*, 445. 14 *J. R.* 210. 20 *id.* 338.) (2.) There has been no partial payment to take the case out of the operation of the statute, and an " acknowledgment or promise" to prevent the operation of the statute upon the claim must be contained in some writing, signed by the party to be charged thereby." (*Code*, § 110.) (3.) The promise must be explicit, or the acknowledgment be of an existing liability, and of a present willingness to pay. A mere acknowledgment of the existence of the debt, and that it has not been paid, is not sufficient. (*A'Court* v. *Cross*, 5 *Bing.* 329. *Commercial Mut. Ins. Co.* v. *Brett*, 44 *Barb.* 489. *Bloodgood* v. *Bruen*, 4 *Seld.* 362. 2 *Pars. on Cont.* 347. *Angell on Lim.* ed. of 1861, § 231. *Winchell* v. *Hicks*, 18 *N. Y. Rep.* 558.) (4.) The promise must be directly to the creditor or some one acting for him. (*Wakeman* v. *Sherman*, 5 *Seld.* 85. 2 *Story's Eq. Jur.*, § 1521 a.) (5.) The action is upon the new promise, or promise implied from the acknowledgment relied upon, and the promise, express or implied, must be unconditional and to pay presently, or the proof must show the condition to be complied with and a cause of action upon the new promise. (*Winchell* v. *Hicks*, 18 *N. Y. Rep.* 558. *Bush* v. *Barnard*, 8 *John.* 407. *Watkins* v. *Stevens*, 4 *Barb.* 168. *Wakeman* v. *Sherman*, 5 *Seld.* 85.) There was no promise, and no acknowledgment proved or found by the referee which

Coleman *v.* Second Avenue Railroad Co.

takes the case out of the statute of limitations. There was no promise or acknowledgment by any competent party. The act relied upon (the resolution of March 3, 1856) was the unauthorized, illegal and void act of the plaintiff's assignors. They claiming to be creditors, and being trustees and directors of the defendants, assumed as trustees to act in behalf of the corporation in matters in which they were personally interested. This the law does not permit. Seven of the eleven directors present were interested as original licensees or assignees of licensees, and had signed the transfer. (*See cases cited above as to the powers and duties of agents and trustees.*)

The promise is not explicit and to pay presently, and the acknowledgment does not indicate a present willingness to pay. The promise, if promise it was, was to pay in a particular way and at a given time, and the acknowledgment must be read in connection with the express undertaking, and no promise or willingness to pay other than in the way and at the time indicated, can be implied. There was, then, no cause of action upon the new promise, at the time of the commencement of the action. There was no promise or acknowledgment *to* the creditors or any one acting in their behalf. At most, it was but a private memorandum made by the debtor for his own use, and never delivered to or acted upon by the creditor. It was attested for the purposes of the debtor by the secretary of the corporation. The secretary never had authority to make any new promise for the debtor. He simply recorded for preservation the acts of the directors, for the benefit and use of the corporation. This was no promise *to* the creditors. In fact, it was but an *entry by the creditors in the books of the debtor*, with the intent to make evidence in support of the claim. In any event, until delivery to the creditor, it did not constitute an available promise for any purpose. (*Smith* v. *Eastman*, 3 *Cush.* 355.) The new promise was not under the seal of the corporation, or signed by any one having authority to sign for the corporation, and to bind it by a new promise,

and thus make, continue or revive an obligation. The signing must be by the party or his authorized agent, and *with intent* to execute a valid instrument and to give authority and validity to the undertaking. (2 *Pars. on Cont.* 286, 7. *Angell on Lim.*, ed. of 1861, § 272. *Hyde* v. *Johnson*, 2 *Bing. N. C.* 776.) To comply with the statute, the promise or acknowledgment should have been under seal of the corporation. (*Fulton Bank* v. *N. Y. and S. Canal Co.*, 1 *Paige*, 311. *Rex* v. *Windham, Cowp.* 377. 2 *Pars. on Contracts,* 288, 9.)

2. The new promise, like the original promise by the party in interest, professing to act for his debtor to himself as the creditor, is void. (25 *N. Y. Rep.* 293.) 3. The rescinding of the resolution of March 3, 1856, on the next day, by the same parties who passed it, and who were the parties beneficially interested, was a voluntary waiver and abandonment of all benefits under it. It was as if the first resolution had never been passed.

VII. The judgment should be set aside, and the complaint dismissed, or a new trial ordered, with costs.

*J. W. Edmonds*, for the respondents. I. As to the statute of limitations. In December, 1852, the grant was made to individuals. In January, 1853, the defendants were incorporated and a sale of the grant to them was agreed upon. In November, 1855, the individual grantees conveyed the grant to the defendants by an assignment under seal, in which the consideration was expressed at $200,000. At the same time the defendants passed a resolution to issue their bonds to the grantees for $200,000, payable in ten years, with semi-annual interest. In October, 1853, before the assignment of the grant had been executed, the defendants gave a mortgage of $60,000 to John O'Brien, on their real estate and rolling stock, and the grantees gave a mortgage on the grant as collateral thereto. In April, 1854, the defendant's gave a mortgage to Enoch Dean for $300,000, on the same premises, not

including the grant. In December, 1857, the defendants gave a mortgage to Martin J. Sheldon for $350,000, on the same premises and including the grant. All these mortgages were given to secure the payment of bonds issued by the company. In March, 1856, the defendants passed two resolutions; one of which declared that the grantees had not been paid their $200,000, but had still a "valid claim against the company for the same." And the other directed that bonds should then be issued to the grantees for the same. These resolutions were entered in full on the minutes of the company and signed by the secretary, and a copy of them, signed by the secretary, was delivered to the grantees. The second of those resolutions (not the first, nor both) was rescinded four days afterwards. This action was commenced on the 9th December, 1861.

On this state of facts and in answer to the plea of the statute of limitations, the plaintiffs insist : I. The action is on a sealed instrument, and the limitation is not six but twenty years. Section 90, of the Code, is, "an action on a sealed instrument." Now this action is on a sealed instrument. It is not material what is the form of the action, whether assumpsit, debt or covenant. As in an action against the assignee of a lease for rent ; or on covenants running with the land ; or in debt, for escape, though case would lie ; or debt against a sheriff for money collected on a *fi. fa.* where assumpsit would lie ; or debt on an award where the submission was by parol. (*Smith* v. *Lockwood,* 7 *Wend.* 241.) In these, and kindred cases, it is not the form of the action but the nature of the debt which controls, namely, whether it was by parol or on a sealed instrument. (*See Blanchard on Lim.* 91, 1 *Law Lib.* 47.) The material question is, is this an action upon a sealed instrument ? (*Pratt* v. *Huggins,* 29 *Barb.* 284.)

II. If, however, the claim is founded on a parol contract, the acknowledgment of the defendants was sufficient to bar the statute. 1. The board of trustees had authority to make such an acknowledgment. (*St. Mary's Church* v. *Cagger,*

Coleman *v.* Second Avenue Railroad Co.

6 *Barb.* 576.   *Crew* v. *Petit,* 3 *Nev. & Man.* 456.   *S. C.* 1
*Ad. & E.* 196.)  2. It was competent for the secretary to
make a proper "signing" within the statute.   (*Code,* § 110.
*Angel & Ames on Corporations,* 231.)

III. The resolution of March 7, 1856, rescinding one of the
resolutions of March 3, in nowise affects the question.  1. It
does not profess to rescind the acknowledgment of indebted-
ness, but only that proposing a mode of paying it.  2. It was
not competent for the defendants to recall their acknowledg-
ment.  The legal effect of an acknowledgment is that of a
promise to pay an old debt, which promise the law implies
from the acknowledgment, and for which the old debt is a
consideration in law.  (2 *Greenl. Ev.* § 440, *note* 1.  *Story
on Cont.* § 1013.)

IV. The acknowledgment was made to the proper parties
and not to a stranger.  Several of the grantees, to whom the
debt was owing, were present when the resolution was passed,
and a duly authenticated copy of it was delivered to them.
Their consent or intention to accept will be presumed, where
nothing to the contrary appears, for the law will presume
that a party will accept what is for his benefit.  (2 *Ph. Ev.
by Edwards,* 662.  *Doe* v. *Knight,* 8 *Dow. & Ry.* 348.  *Stir-
ling.* v. *Vaughan,* 11 *East,* 623.  *McKinney* v. *Rhoades,* 5
*Watts,* 344.  *Waller* v. *Todd,* 3 *Dana,* 513.  *Church* v.
*Gilman,* 15 *Wend.* 656.  *Jackson* v. *Bodle,* 20 *John.* 184.
*U. S.* v. *Wilson,* 7 *Peters,* 150.  1 *Ph. Ev. by Edw.* 609.)
A delivery may be inferred from words without acts, and
from acts without words.  (2 *Ph. Ev. by Edw.* 662.  *Good-
rich* v. *Walker,* 1 *John. Cas.* 250.  *Verplank* v. *Sterry,* 12
*John.* 536.)  A formal delivery is not essential where it is in-
tended to take effect.  (*Doe* v. *Knight,* 8 *Dow. & Ry.* 348.)

II. The defendants insist that at the time of the assign-
ment of the grant to them in November, 1855, they were in
the possession and enjoyment of the grant and its privileges,
and were the owners thereof.  To which we answer :

1. It is true they were in possession and enjoyment of the

grant, but under an agreement to sell it to them for $200,000, which agreement was consummated in November, 1855, by the execution of the assignment on the one part, and the agreement to issue bonds in payment on the other part.

2. The defendants were never *owners* of the grant until the assignment was executed, and up to that time all the parties regarded the grantees as the owners. Then, as a matter of fact, it is not true that the defendants were owners at the time of the assignment.

3. For the consideration money expressed in the assignment, which assignment the defendants accepted, an action will lie against them, it being admitted that such consideration money had never been paid. (*Shephard* v. *Little*, 14 *John.* 210. *Brown* v. *Bell*, 20 *id.* 338.)

III. The defendants insist that the grant was void, and conferred no privileges on grantees or company. To which we answer :

1. In their first point of defense, they admit they were in possession of the grant, and were running their road under it.

2. It was confirmed by the legislature. (2 *Laws of* 1854, *p.* 324, § 3.) The confirmation was of all grants then (April 4, 1854) in part constructed. The evidence was that at that time, this road was built from Peck slip to 42d street. In 1855, they had a grant made to them of a right to bridge the Harlem and Bronx rivers. (2 *Laws of* 1855, *p.* 712.) In 1857 a law passed authorizing a change of route. (*Laws of* 1857, *p.* 177.) 3. As evidence of the value of the grant, it was proved that one of the grantees was paid $3000 for 1-40th. 4. In a suit of the city against the defendants, to recover an annual tax on each car, the defendants set up, as a successful defense, this very grant. (12 *Abb. Pr.* 304.) 5. In their annual reports for 1854 and 1855, the defendants state the whole value of their property at $1,000,000, yet they had expended only $727,741.05. 6. Such grants as this was, whether by the common council or legislature, are held to be property,

and valuable as such, and not mere revocable licenses. (*Drake* v. *Hudson River R. R.*, 7 *Barb.* 536, 558. *O'Conor arguendo*, 22 *id.* 455, and 3 *Abb.* 262. *Plant* v. *Long Island R. R.*, 10 *Barb.* 26. *Milhau* v. *Sharp*, 15 *id.* 214, 228. *S. C. Court of Appeals*, 27 *N. Y. Rep.* 611. *Mayor, &c.* v. *2d Av. R. R.*, 12 *Abb.* 364., 7. The defendants uniformly treat the grant as valuable property.

IV. The defendants claim that the grant was given to them by the grantees, to which we answer : 1. There is no evidence of this. 2. The claim is a mere inference from the fact that the grantees became directors of the company. 3. The directors or grantees were not the only stockholders of this company. The whole number of shares was 8000. The grantees had 3600 shares, and so they made a present of this grant to the owners of the 4400 shares, who had no interest in it, except by gift or purchase. That is the plain English of this claim. The grantees were nine ; the directors were thirteen. 4. The mention of the consideration in this conveyance is *prima facie* evidence of the amount. (4 *Kent's Com.* 562. 1 *Greenl. Ev.* § 26, n. 1. *Maigley* v. *Hauer*, 7 *John.* 342. *Jackson* v. *McChesney*, 7 *Cowen*, 361. *Thalhimer* v. *Brinckerhoff*, 6 *id.* 102.)

5. It being admitted in the pleadings that the consideration money has not been paid, assumpsit will lie for it. (*Shepherd* v. *Little*, 14 *John.* 210. *Bowen* v. *Bell*, 20 *id.* 338. *Whitbeck* v. *Whitbeck*, 9 *Cowen*, 266, 270. *McCrea* v. *Purmort*, 16 *Wend.* 460, 475.)

6. That the claim was valid and outstanding, has been over and again admitted by the railroad company. In June, 1853, when $300,000 of stock is disposed of, grantees to be paid the amount advanced by them towards building the road. In July, 1853, to divide $500,000 of stock among grantees. December, 1853—Grantees to have full stock for the amount paid in, and scrip be left with the treasurer. January, 1854 —Treasurer's report, $70,200 paid in by grantees ; $81,700 by stockholders. September, 1854—$400,000 to be placed

to credit of grantees. December, 1854.—$100,000 to be placed to the credit of grantees. February 3, 1855.—Rescinding resolution as to $400,000. stock to grantees. November, 1855. —Bonds for $200,000 to be issued to grantees. It was at this time the assignment of the grant to the company was actually made and delivered.

November 1855.—That resolution rescinded. This was after the assignment had been made.

February 6, 1854.—Certificate of election which was held " pursuant to grant, charter and by-laws." March, 1856.— Committee appointed in relation to payment for grant. This was by the new board, and two of the new directors were on the committee. O'Brien, the chairman.

May, 1856.—On motion of O'Brien, Hutchins and Rapelye were added to the committee. July, 1856.—Committee reported, and report accepted ; committee continued. The propositions of that committee. Note, how the committee was formed. 7. The mortgages given for the debts of the company recognize the claim. 8. The original grant and the assignment, (specifying a *sale* for $200,000, not a gift,) are in the. possession of defendants, and by them now produced, so that it was delivered to, and accepted by the company, for the consideration of $200,000. (2 *Greenl. Ev.* § 297.) 9. All these proceedings culminated in the direct contract to pay. It was competent for the railroad company to take that action, and thereby bind themselves and successors. (*St. Mary's Church* v. *Cagger*, 6 *Barb.* 576. *Moss* v. *Rossie Lead Co.*, 5 *Hill*, 137. *Moss* v. *McCullough*, 7 *Barb.* 279. *Peterson* v. *City of N. Y.*, 17 *N. Y. Rep.* 449. *Dunn* v. *Rector of St. Andrew's*, 14 *John.* 118. *Danforth* v. *S. Turnpike Co.*, 12 *id.* 227. *Patterson* v. *Bank of U. S.*, 7 *Cranch*, 297, 307. *Buffalo Com. Bank* v. *Kortright*, 22 *Wend.* 348.) 10. The by-laws of the railroad company avow that the company was formed to operate the grant, and from that the company infer that there never was a sale of it by the grantees to the company.

We answer : 1. The grant was property. It has been so held by this court. (15 *Barb.* 214, *and cases before cited.*) 2. It was valuable as property to the company, and to the grantees. The suit with the city shows that it was worth at least $50,000 to the company, besides its value as a monopoly. The prices paid among the grantees and their assignees, show that it was regarded by the grantees as worth, at least, $160,000. The company, over and over again, recognized it as of value. (3.) Yet nothing has ever been paid to the grantees. No stock was ever taken by, or given to, the grantees, but what they paid for. (4.) The averment in the by-laws is not inconsistent with the idea that the company were to pay for the grant which they were to operate, and does not, by necessary implication, establish a gift of the grant. (5.) The story is a simple one. Nine persons were owners of a grant, supposed to be very valuable. They wanted a company organized to operate the grant. They organized a company for that purpose, in which persons were to be interested in the proportions they contributed. They took stock themselves, and paid for all they took. And they expected all the parties in interest, including themselves, that is, all the stockholders, to pay for the grant. From the beginning to the end of the proceedings, there is nothing inconsistent with this view, but everything is consistent with it. 2. The certified copy resolution in our possession, and Attwood's report, the appointment of a commission, and O'Brien's propositions. Under these circumstances the question occurs, Is this a gift or a grant by us ? A gift is always gratuitous. A grant is always for some consideration or equivalent. A gift must always be accompanied by immediate possession. If not, it is void. Here was no possession till 1855, and consequently, if a gift, could be revoked. Could these grantees, after the act of 1854, have revoked this gift, and themselves operated the grant to the exclusion of the company ? The act of 1854, page 324, § 3, confirms the grants, licences and resolutions under which the roads have been constructed.

Coleman *v.* Second Avenue Railroad Co.

This road had been constructed entirely under this grant, and it was this grant that was confirmed. To whom ? To those to whom it belonged ; and it belonged to the company when paid for.

V. The fifth objection made by the defendants to a recovery is, that our assignment of the grant was without consideration, and void.

We answer : 1. The assignment is under seal, and imports a consideration. (2 *R. S.* 406, § 77. 2 *N. Y. Stat. at large,* 423, § 77, *note.*)

2. The assignment expresses a consideration of $200,000. By accepting it, the defendants admit a consideration. (*Maigley* v. *Hauer,* 7 *John.* 342.) Evidence of another consideration excluded. (*Jackson* v. *McChesney,* 7 *Cowen,* 361.) The paper is *prima facie* evidence of consideration and its payment. (*Thalhimer* v. *Brinckerhoff,* 6 *Cowen,* 102, *S. P.*)

3. While thus it was open to the defendants to prove no consideration, they have given no such evidence, and therefore our *prima facie* evidence becomes conclusive.

4. By accepting and working under the grant, as thus assigned to them, the defendants have ratified it, as a sale to them for a valuable consideration, of that which was of intrinsic value, and not having paid for it, are now liable for the price. (*Moss* v. *Rossie Lead Co.* 5 *Hill,* 137. *Moss* v. *McCullogh,* 7 *Barb.* 279. *Peterson* v. *New York,* 17 *N. Y. Rep.* 449.)

LEONARD, J. The grant from the Mayor, &c. of New York to Denton Pearsall and others, for the perpetual right to run a railroad through the Second avenue for the transportation of passengers, was valuable ; it was transferred by the grantees to the Second Avenue Railroad Company, an incorporation duly created ; the company accepted and used the grant ; the company set it up successfully as a defense to an action by the mayor, &c. of New York, to recover penalties for the nonpayment of a license fee for each car, attempted to be imposed

by the city; and no consideration for such transfer has ever been paid.

The principle that trustees, directors and others, acting in a trust relation, cannot make valid contracts with themselves affecting the trust estate is well established, and clearly applicable here. The trustees cannot fix the price of the property of the trust estate which they take under the name of a purchase; nor can they sell to the estate which they represent, and conclusively settle the price to be received. Where the trustees have bought or sold such property as it was necessary for the estate which they represented to buy or sell, at fair and reasonable prices, the transaction is not necessarily to be disturbed. But if the price is unreasonable, or unfair, or any fraud or advantage has been imposed or taken, courts are swift to hold the transaction void, or to open the contract so as to fix a proper compensation between the trustees and the estate which they represent, as upon the whole transaction may be just.

Applying these rules to the present case, it will be found that the grantees from the city corporation, being a majority of the trustees of the Second Avenue Railroad Company, undertook to settle the price at which the company should receive an assignment of the said grant from themselves. The resolutions, so far as they created any evidence in their own favor, were wholly nugatory and void. The company was organized with the expectation that the grant was to be transferred to it, and the assignment was executed pursuant to the plans of the promoters of the company. I do not think that the assignment can be called fraudulent or void. The action is to recover the consideration. It was not in the power of the trustees of the company to name the price for the transfer of the grant from themselves to the company. That is a question which must necessarily remain open. The consideration named in the transfer was not conclusive upon the company.

The defendants, insisting that the transaction is wholly

Coleman *v.* Second Avenue Railroad Co.

void, have offered no proof as to the actual or proper valuation of the grant. They chose to submit the case without any proof on this subject, and the inquiry is now closed. I am unable to see that they are now entitled to any relief on the question of consideration or value.

On the question of the statute of limitations, the action of the whole board of trustees, during the time the grantees were members, contained sufficient acknowledgments in writing, signed by the defendants, to take the case out of the operation of the statute, if they possessed any validity. But the same reasons which prevent the trustees from fixing their own value upon the grant, operate to preclude any construction whereby a right of action can be given to themselves, or any prejudice created to the railroad company which will accrue in an advantage to themselves. Without the benefit of the resolutions of the company, passed while the grantees constituted a majority of the members of the board of trustees, and more than six years having elapsed since the cause of action accrued, there is no existing promise to revive the demand. The statute appears to be a conclusive bar.

The argument that this is an action upon a sealed instrument, and therefore is not barred until the lapse of twenty years, cannot be sustained. The action is to recover the price of property conveyed at an agreed or implied valuation. There is no breach of any agreement under seal, alleged or proven. The fact that the grant is assigned by an instrument under seal, has no bearing upon the action, in this respect.

The judgment should be reversed and a new trial ordered, with costs to abide the event.

There is also an appeal from an order sending the case back to the referee, and allowing the defendant Sealey to put in an answer to the complaint, setting up a claim to a share of the money alleged to be due from the railroad company for the said grant, and directing the referee to proceed and

ascertain the amount due to Sealey, and allowing him to enter judgment for such amount as may be reported to be due him. No judgment had been entered on the report. Sealey was the owner of a share of the price due for the grant. He had refused to join in the action, and had therefore, under the provisions of the Code, been made a party defendant. He did not thereby lose his demand. The relief granted appears to be within the discretionary power of the court, and the order should be affirmed with $10 costs to the respondents.

If I am correct as to the statute of limitations, the disposition made of this order appears to be of little consequence.

I am for reversing the judgment, ordering a new trial before the same referee, with costs to abide the event; and also for affirming the order allowing the assessment of damages due to Sealey, &c. with $10 costs against the appellants.

INGRAHAM, J. I concur as to the statute of limitations. I am also of the opinion that the owners of the grant from the city, having formed themselves into a corporation and invited others to come in as stockholders and assist in erecting and building the road on the line of this grant, and having held out the idea that the corporation owned the right to the road, cannot take as directors, to themselves as the owners of the grant, the whole capital stock for the privilege obtained from the city.

If they had a right to vote any compensation therefor to themselves, they had the right to fix the price. Such a mode of disposing of the whole capital stock, by the grantees from the city, as directors, to themselves as individuals, ought not to be sustained. They received the benefit of the grant as stockholders, and if they invite others to take stock and put themselves in as directors, I can see no equity in allowing them to take the capital of the company to their own use merely because they are directors and form a majority of the board.

· . There never was any sale agreed on.  The subsequent transfer was only preparatory to passing the resolutions to pay themselves, and none of them should have the effect of making a contract, or of creating admissions to avoid the statute of limitations.

I concur in reversing the judgment.

SUTHERLAND, J. concurred.

Judgment reversed, and order affirmed.

[NEW YORK GENERAL TERM, April 1, 1867.  *Leonard, Sutherland* and *Ingraham,* Justices.]